# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY,

OCTOBER TERM, 1881.

---

THEODORE RUNYON, ESQ., ORDINARY.

---

CATHARINE E. COLLINS et al.

*v.*

ABRAM J. OSBORN et al., exrs.

A testator eighty-five years old when he died, and blind for the last fifteen years of his life, lived for many years and until his death with one of his sons, who took care of him. He left two sons, several daughters and grand-children surviving.—*Held*, no evidence of incapacity that he gave all of his land to his two sons, charged, however, with legacies to his daughters and grandchildren, although, by a codicil executed three years before his death he reduced all of the legacies, because he apprehended that the legacies and his own debts would prove too great a burden for his sons, when, in fact, at that time, a part of his lands had increased considerably in speculative value; nor the omission of some of his grandchildren from his bequests, nor the fact that the disposition of his property is grossly unequal.

Appeal from decree of Monmouth orphans court.

*Mr. W. H. Vredenburgh,* for appellants.

*Mr. C. Haight,* for respondents.

THE ORDINARY.

This appeal is from the decree of the orphans court of Monmouth county, admitting to probate three instruments of writing (a will and two codicils) as the will of James Osborn, deceased, late of that county. The testator died on the 11th of June, 1880. He was then over eighty-five years old. For many years before his death he had been blind. The will in question was made December 19th, 1872; one of the codicils, August 5th, 1876, and the other, August 17th, 1877—so that the will was made seven years and a half before his death; the first of the codicils about four years, and the other about three years. He had outlived some of his children, both sons and daughters, and the surviving daughters had married and gone away from him. For many, about fifteen, of the last years of his life he was blind and wholly dependent (he was a widower) on his two surviving sons, Abram and Andrew (especially the latter), for the necessary attention to his physical wants. He always lived on his farm, which bordered on Squan river. He made a will in 1870 (drawn by Mr. A. R. Throckmorton), which is in evidence. In 1872, he made the will in dispute. By it he gave to Abram, by metes and bounds, part (fifty-five and twenty-nine hundredths acres) of his farm, excepting thereout the family burying-ground of about half an acre, for a burial place for his family and their descendants forever. The devise was, however, subject to the payment, in one year after his decease, of a legacy of $300 to his daughter Mrs. Herbert, which he charged thereon. To his son Andrew he gave, by like particular description by metes and boundaries, another part, about one hundred and three acres, of the farm, subject to the payment of legacies, payable in one year from his death, thereby charged thereon, one of $500 to

Collins v. Osborn.

his daughter Mrs. Collins, and the other of $300 to his daughter Mrs. Day, who was then living, but died May 15th, 1879. He gave to Abram and Andrew also a tract of pine land and cedar swamp of about twenty-three acres, which he described, on the south side of Squan river, in Brick township, Ocean county, owned by him, together with a certain other designated cedar swamp on the south side of Beaver Dam creek in that township. He empowered his executors to sell all the rest of his real estate and pay his debts out of the proceeds. He then gave to his daughter, Mrs. Twitchell, a legacy of $300, to be paid to her in one year from his death, out of those proceeds, if sufficient for the purpose, but if not, then he directed that it be paid by Abram and Andrew, and charged it on the land devised to them. He then gave $100 apiece to Edwin, Marion, Winfield and William Osborn, the four children of his deceased son Benajah, to be paid in one year, and payable out of the proceeds of the land ordered sold, if sufficient, but if not, then by Abram and Andrew, and he charged those legacies on the land devised to them. He then directed that the residue of his real estate be sold, and ordered that his debts be paid out of the proceeds of the sale, and gave to Abram and Andrew the residue of his estate after paying his debts, funeral expenses and the expenses of settling his estate, and the legacies to Mrs. Twitchell and Benajah's children, and provided that any deficiency in paying those debts, expenses and legacies should be chargeable on the land devised to them.

He made Abram and Andrew his executors. By the first codicil, which was made about three years and a-half after the making of the will, he ratified the will except as altered or changed thereby, and gave to Ann, daughter of his deceased son George, a legacy of $400, payable in one year from his death, out of the proceeds of his real estate ordered to be sold, charging it, in case of deficiency, on the land devised to Abram and Andrew.

By the last codicil, made August 17th, 1877, about a year afterwards, he states that his indebtedness is such as to render a change in the will and previous codicil necessary, in his opinion, and, ratifying those instruments except as changed thereby, he

reduced the amounts of the legacies as follows: Mrs. Herbert's from $300 to $200; Mrs. Collins's from $500 to $200; Mrs. Day's from $300 to $200; Mrs. Twitchell's from $300 to $200; the legacies to the four children of Benajah, from $100 each to $50 each; and the legacy to Ann, daughter of George, from $400 to $100. The reductions together amounted to one-half of the gross amount of the legacies: that is, they were reduced from $2,200 in the aggregate, to $1,100.

That the testator, at the time of the execution of each of these instruments, was possessed of competent testamentary capacity, is proved beyond all doubt. To his execution of all of them, his friend and neighbor and family physician, Dr. Robert Laird, was a witness, and his execution of the will and the last codicil was witnessed by Mr. A. R. Throckmorton, the lawyer by whom all the instruments were drawn. They two were the witnesses to the will. To the first codicil, Dr. Laird and John D. Warner, now deceased, were witnesses, and the execution of the last codicil was witnessed by Dr. Laird, Mr. Throckmorton and Joseph Thompson. The instructions for drawing all these instruments were received by Mr. Throckmorton from the testator himself, and under circumstances leading to the conviction that the testamentary acts were the result of the deliberate and free action of the testator's mind and will. Dr. Laird was his next neighbor. He had known the testator for nearly half a century, and had been his family physician for about forty years, and was intimately acquainted with him for all that time. Mr. Throckmorton had known him personally and intimately for about twenty-five years. Mr. Thompson, who is one of the witnesses to the first codicil, knew the testator well. He was, at the time when that instrument was signed, living on the farm as a tenant on shares, and had been so for about five months, and during all that time had, with his family, occupied part of the house, while the testator and his son Andrew occupied the other part. The testamentary witnesses, then, were all well acquainted with the testator, and, consequently, were able to judge of his capacity at the time of doing the testamentary acts under consideration. Dr. Laird, in his testimony, says that, during the last ten years

Collins v. Osborn.

of the testator's life, he had frequent conversations with him; that they talked on general subjects and on business matters, and the testator's own business; that the testator talked to him about his wishes in the disposition of his property; that, during those ten years, he always found him a strong-minded man; that his mind was clear—as clear as anybody's; that he thinks his memory was very good—rather extraordinary; that he had conversations with him at the time the will and codicils were executed, and he thinks his mind and memory were perfectly good at the time when he executed those instruments; that he had always been intimate with the testator and his family; that the testator was always considered a very firm man, and he considered him so himself; and he adds that he thinks that that characteristic continued up to the time of his death. It appears that the testator communicated to him his wish to make the will and the codicils, and, through him, communicated to Mr. Throckmorton his desire that he would come and see him for the purpose of drawing those instruments. Mr. Throckmorton has been a practising lawyer for about thirty-eight years. The will and codicils were, as before stated, all drawn by him, and they are all in his own handwriting. He had, as already mentioned, drawn a will for the testator in 1870. He says that, on the day the will in question was executed, he went to see the testator, in pursuance of the latter's request communicated to him by Dr. Laird; that, after talking with the testator on general subjects, the testator told him he wanted to change his will, and, in reply to his inquiry, told him what changes he wanted to make; that he then made a memorandum of them, and then and there, in the presence of the testator, and entirely under his directions and instructions, drew the will; that after he had drawn it, he read it over to the testator, and asked him if it was satisfactory to him, and he replied that it was; and it was then executed. He says no one else besides the testator and Dr. Laird (whom he had taken with him to witness the will) and himself were in the room, and that he was there two or three hours. He says the testator's mind was, in his judgment, sound, and that, from his observation and knowledge, the testator was entirely

competent to execute the will. In like manner, he received his
instructions from the testator for the first codicil, at the house
of the latter, but, for want of time, did not draw it there. He
drew it at his office in Freehold, and sent it to Dr. Laird, with
directions as to the way in which it was to be executed, and, as
before stated, the execution of that instrument was witnessed by Dr.
Laird and Mr. Warner. Before it was executed, Dr. Laird read
it over to the testator, and he approved it, and said it was what
he wanted done. Mr. Throckmorton also took his instructions
for the last codicil from the testator, at the testator's house, and
drew it there, and after he had drawn it, read it to the testator,
and asked him if it was satisfactory to him, and as he wished it
to be, to which the testator replied that it was; and it was there-
upon executed. He says that, at the time of drawing the will
and codicils, the testator's mind and memory were, in his opinion,
entirely sound. He also says, in view of the testator's age and
infirmity (his blindness), he took pains to ascertain the condition
of his mind and memory before drawing the will and codicils;
that his mind seemed to be clear and his memory good, and
that when the testator gave him his instructions for drawing the
first codicil, the testator told him he had changed his mind with
regard to one of his grandchildren, the daughter of his deceased
son George—that he had at first thought that he would not give
her anything, but had concluded to give her a small legacy. The
gift of that legacy is the only change made by that codicil in the
disposition of his property made by the will. He further says
that, when the last codicil was made, the testator told him that
he wished to make changes in the legacies he had given, and
stated what they were, and gave, as his reason, that he was
afraid the boys would not be able to pay the debts and legacies
and retain the property, and that he did not want the property to
go out of the family.

There is also the testimony of other witnesses, besides those
who witnessed the execution of the instruments, to the tes-
tator's competency. Elias Allen, called for the caveators, testi-
fies to a business transaction (the renewal of the testator's note,
which he held) which he had with the testator about a year

before the latter's death. He says that he and the testator both talked much and fast, on the occasion; that the latter knew what he was talking about, and seemed to understand the subjects on which he conversed; that the testator acknowledged that he owed him, and expressed a desire to pay him; that they were an hour together; that he talked to him about a neighborhood matter, before the testator's son Andrew came in, and his mind appeared to be, as the witness expresses it, "as clear as a bell." This witness was a near neighbor of the testator, and owned a farm adjoining that of the latter. He is sixty-eight years of age, and was a relative of the testator, and had known him all his life. Allen Osborn, also called for the caveators, was also a near neighbor, and was a relative (a nephew) of the testator. He is sixty-nine years old. He says he was at the testator's house between four and five weeks before he died, and again about a week before his death, and he had seen and conversed with him, and spent part of the day at his house, about three years previously. He says the testator was a strong-minded, energetic man, and that his mind was good and clear till he died. Charles Osborn, sworn for the proponents, was also a neighbor (living on an adjoining farm) of the testator. He is fifty years old, and was, he says, always intimate with the testator, and saw him frequently during the last fifteen years of his life. He says he visited him occasionally, every month or so, he supposes, and sometimes, perhaps, two or three times a month; that on the occasion of the visits he talked with him about business and other matters; that he sometimes stayed an hour and sometimes half an hour, and would converse with him; that he never saw him when his mind was not as good as ever it was, for aught that he could see; that his memory was good, and in the different conversations which he had with him, the testator was always rational and clear; that he always seemed to be cheerful when he saw him during the last ten years of his life, and that he was a firm and decided man—very much so—and retained those characteristics up to his death.

John A. Osborn knew the testator for thirty-five years. He boarded in the testator's house with Andrew for about six

months in 1878, and about seven or eight months in 1879, and saw the testator every day during those periods. He says he does not think he ever saw him when he was not rational; that his memory was very good; that during the last ten years of his life he had a clear mind and retentive memory, and that he thinks he was as firm and self-willed a man as he ever saw. Forman Osborn was a nephew of the testator, and knew him for forty years. He went to see him about once or twice a year up to the time of his death, and would stay an hour or two, or three. He says his mind was all right and his memory good; that he was a pretty strong-minded man, and, he should think, firm and decided. To say the least of it, the evidence of his capacity is in nowise shaken by the testimony adduced with a view of proving the contrary. Nor is there any evidence of undue influence or imposition or artifice of any kind. The instruments were executed with all due legal formalities. It is evident that at the time of making the will and codicils the testator not only fully understood the business in which he was engaged, but knew what property he had, and had mind and memory sufficient to enable him to dispose of it intelligently. He knew what his property was, and to whom he was giving it.

It is urged, however, on the part of the caveators, that he did not know or appreciate the value of his farm; that it was worth a very large sum of money, and that the fact that by the last codicil he, under the apprehension that his sons would not be able to pay his debts and those legacies (which were small in comparison with the value of the property) as they stood, and retain the property, reduced the legacies to his daughters and the grandchildren to whom he had made bequests, is evidence of want of capacity. And it is also urged that the fact that he gave no legacies to, and made no mention of, the children of some of his deceased children, and the fact that his disposition of the property is grossly unequal, are evidence in the same direction. To consider the first of these objections: There were at the testator's death three mortgages on the homestead property; one originally for $2,750 and interest, given in 1869, on which he appears to have paid $400; another of $150 and the

other of $300. Apart from the speculative value (which is probably a real and very considerable one) which has of late been given to that part of the farm which lies on the Squan river, by reason of its eligibility for summer residences, the farm appears not to be very valuable. One of the witnesses says that the part of it which adjoins his land is not worth $5 an acre now. It is apparently a small part, however. According to the testimony, the property now is worth from $10,000 to $20,000, and perhaps much more. But, in considering this objection, it is to be remembered that it was the testator's expressed wish to keep the property in the family. Mr. Throckmorton says that when he received his instructions for the last codicil he asked the testator "why he was cutting the girls down—if he could not give them more;" and the testator said that, "taking the valuation of the real estate, and the amount of his indebtedness, and the amount of the legacies, he was afraid he was overloading the boys, and he was afraid they would not be able to keep the farm; the encumbrance would be too heavy, and they would be obliged to sell it, and he did not want it to go out of the family." He further says that he spoke up for the girls, but the testator seemed fixed, and he adds that he thinks he understood the valuation of his property.

The testator seems to have intended to leave his farm to his sons before the will in question was made. By the will of 1870, he gave it to his then three sons, Abram, Andrew and George, but between that time and the making of the will of 1872, George died. By the will of 1870, he gave to Abram the same part of the homestead farm given by the will of 1872, subject to a legacy of $300 to Mrs. Herbert. He gave to George, subject to a legacy of $300 to Mrs. Twitchell, another part of it, seventy-five and twenty-six hundredths acres, and a small island, known as Osborn Island, containing about three acres of upland (including shore about seven acres), and another tract of about twenty-three acres, and to Andrew he gave, subject to a legacy of $950 to Mrs. Collins, and one of $450 to Mrs. Day, the same part of the homestead farm, about one hundred and three acres, given to him by the will of 1872.

The cedar swamp he gave to the three sons, and he gave them the residue of his property, subject to his debts and funeral expenses and the expenses of settling his estate, directing that they should bear equally any deficiency on the payment of those debts and expenses, and the encumbrance on his homestead, after applying his personal estate and the proceeds of the land which he ordered sold. He made his three sons his executors. It will be seen that by the will of 1870, he gave all his property, except the land which he ordered to be sold, to his three sons, subject to legacies amounting, in the aggregate, to $2,000, to his daughters, Mrs. Twitchell, Mrs. Collins, Mrs. Herbert and Mrs. Day; and by the will of 1872, he gave the same property to his two surviving sons, subject to legacies to the same daughters and the children of one of his deceased sons, amounting, in the aggregate, to $1,800. Both wills exhibit the same plan of disposing of his property, and demonstrate his intention to leave his land to his sons, subject to such legacies as he might see fit to give to his daughters and such of his grandchildren, if any, as he might designate. And it appears that part of his design was to keep the land in the family. Dr. Laird testifies that while George was alive, the testator told the witness that he wanted to divide his property among his three boys, and he got a surveyor and ran it out; and he says that after the survey was made, the testator talked to him about the monuments &c., and that he told him about the lines, which way they went and where they came out. Nor is there evidence of any declaration of the testator made, at any time, of any intention or disposition to make any distribution, either more favorable to his daughters and the children of his deceased children, or less favorable to his sons, than is made by his testamentary acts. It is quite possible that he did not fully realize the value which the farm had acquired by reason of the railroad facilities, which have made the part of it bordering on the river desirable as sites for summer residences; but that fact, if admitted, does not, by any means, demonstrate his want of testamentary capacity, and is not sufficient ground on which to set aside his will. If the land ordered sold had a speculative value sufficient to remove all apprehension

Collins v. Osborn.

of necessity to sell the rest, it would, at most, show that his ap-
prehension that his sons would not be able to pay the encum-
brances without selling the land devised to them, was unfounded.
There is also evidence that he had other reasons for giving the
greater part of his property to his two sons, and comparatively
little of it to his daughters and grandchildren.   Ann Jones, who
was housekeeper at the homestead, says that she has heard him
say that Andrew had taken care of him since he was blind, and
had been a good boy to him, and that Andrew should lose noth-
ing by him; and that the girls had done nothing for him and
cared nothing about him, and that he had done a great deal for
them.   But the testator's testamentary capacity having been es-
tablished, his will will not be set aside because of inequality in
the disposition of his property.   He had a right to make such
distribution of his estate as he pleased.   *Stat pro ratione voluntas.*
If he had a sound and disposing mind, his dominion over his
property and his right to make such disposition of it as suited
his inclination, will be recognized.   To hold the contrary, would
be to substitute, to a certain extent at least, the will of the court
for that of the testator.

"If we are clear," says Judge Potts (in the orphans court), in *Turner* v.
*Cheesman, 2 McCart. 243, 257,* "that this is the testator's codicil, and ex-
presses the will of a sound and disposing mind, we cannot look beyond it for
his reasons or his motives for doing what he did.   The right of absolute do-
minion which every man has over his own property is sacred and inviolable.
The argument is only legitimately applicable so far as it affects the question·
of the testator's capacity at the time."

"A testator," said the court, in *Boylan* ads. *Meeker, 4 Dutch. 274, 277,* "has
the right to make an unreasonable, unjust, injudicious will, and his neighbors
have no right, sitting as a jury, to alter the disposition of his property, simply
because they think the testator did not do justice to his family connections."

"It may be harsh and severe," says the court in *Den* v. *Gibbons, 2 Zab. 117,
153,* "it may be extremely cruel, under some circumstances, to disinherit one
child and to bestow the whole estate upon another, but if the testator be of
disposing mind and memory, and duly execute such will in the form pre-
scribed by law, no court can interfere."

In the case in hand, it is not difficult to supply motives for
giving the greater part of the property to the two sons.   They

alone had attended to the testator's wants, and cared for him when he most needed care and attention. And it is quite probable that if it had not been that the homestead farm has recently acquired the speculative value before referred to, the inequality now urged against the will would not have challenged complaint.

In *Humphrey's will, 11 C. E. Gr. 513*, affirmed on appeal, *sub nom. Jenkins* v. *Moore, 12 C. E. Gr. 567*, it was said by this court:

"A discrimination made by a man of the testator's age [he was very old] and in his condition [he was blind] in disposing of his estate in favor of his only daughter, who had given to him her whole time, and with assiduous attention ministered to his wants when he most needed care and sympathy, can neither be regarded as evidence of incapacity or undue influence."

The decree of the orphans court admitting the instrument to probate, should be affirmed, with costs of the appeal and a counsel fee of $100 to each side, to be paid out of the estate.